IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

SARAH JACKSON-BOONE,

      Plaintiff,

v.                                  CASE NO. 1:13-cv-34-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

      Defendant.

_____/

## O R D E R[1]

    Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits pursuant to Title II of the Social Security Act (the Act). (Doc. 1.)   The Commissioner has answered, and both parties have filed briefs outlining their respective positions.  (Docs. 10, 14, 15.)  For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

    Plaintiff protectively filed applications for a period of disability and disability insurance benefits in February 2009, alleging disability due to carpal tunnel syndrome, arm, shoulder, and back issues, depression, panic attacks, and anxiety.  (R. 130-31, 166.)  Plaintiff's applications were denied initially and upon reconsideration.  (R. 75-77, 79-80.)  An administrative hearing was held before an Administrative Law Judge

---

[1] The parties have consented to have the undersigned U.S. Magistrate Judge conduct all proceedings in this case. (Docs. 8, 9.)

("ALJ"), and on December 23, 2011, the ALJ issued a written decision finding that Plaintiff was not disabled.  (R. 23-33.)  The Appeals Council denied Plaintiff's request for review on December 16, 2012.  (R. 1-6.)  Plaintiff then filed her Complaint raising one issue on appeal: whether the ALJ erred at step two by not finding that Plaintiff's chronic back pain, bilateral carpal tunnel syndrome, rotator cuff tear, depression, and migraine headaches were severe impairments.  (Doc. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5]

--------

[2] See 42 U.S.C. § 405(g) (2000).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from

However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7]  The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9]  First, if a claimant is working at a substantial gainful activity, he is not disabled.[10]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[11]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is

---

evidence on which the Commissioner relied).

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] 20 C.F.R. § 404.1520(c).

disabled.[12]   Fourth, if a claimant's impairments do not prevent him from doing past

relevant work, he is not disabled.[13]   Fifth, if a claimant's impairments (considering his

residual functional capacity ("RFC"), age, education, and past work) prevent him from

doing other work that exists in the national economy, then he is disabled.[14]

     The burden of proof regarding the plaintiff's inability to perform past relevant

work initially lies with the plaintiff.[15]   The burden then temporarily shifts to the

Commissioner to demonstrate that "other work" which the claimant can perform

currently exists in the national economy.[16]   The Commissioner may satisfy this burden

by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive

determination that a claimant is disabled or not disabled.[17]

     However, the ALJ should not exclusively rely on the Grids when "the claimant

has a non-exertional impairment which significantly limits his or her basic work skills or

when the claimant cannot perform a full range of employment at the appropriate level of

---

[12] 20 C.F.R. § 404.1520(d).

[13] 20 C.F.R. § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[16] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[17] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

exertion."[18]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[21]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## III.  SUMMARY OF THE RECORD

### A.    Medical History

During the relevant period, Plaintiff received primary care treatment from Shands at UF Clinic.  On January 29, 2008, Dr. Crystal Comeau treated Plaintiff for her complaint of right shoulder pain.  (R. 310.)  Plaintiff complained that her shoulder was "frozen," and she was having difficulty with raising her arm and was unable to touch her back with her arm. *Id.*  Plaintiff denied any radiation of the pain down her arm. There

---

[18] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[19] Walker, 826 F.2d at 1003.

[20] Wolfe, 86 F.3d at 1077-78.

[21] *See id*.

was no tingling or numbness in her fingers, and she did not have any loss of grip. *Id.* Dr. Comeau recommended conservative treatment and referred Plaintiff for physical therapy. *Id.* Dr. Comeau advised Plaintiff to continue with ibuprofen as needed for pain, and prescribed Flexeril, a muscle relaxer. *Id.*

Plaintiff underwent a diagnostic  radiology consultation of her thoracic spine and right shoulder at Shands Hospital on February 22, 2008.  (R. 323.)  The results of the MRI exam of her spine did not reveal any acute fractures and showed that Plaintiff's "thoracic vertebral body height and alignment are well maintained." *Id.*  The MRI did reveal, however, some  "degenerative anterior and lateral osteophytic spurring in the mid and inferior thoracic spine." *Id.* It was also observed that low-lying cerebellar tonsils "may represent Chiari one malformation."  (R. 327.)

The MRI exam of Plaintiff's right shoulder showed no evidence of a displaced fracture or dislocation. It revealed only "mild" degenerative changes .. in the AC joints. (R. 324.)  Plaintiff's exam notes disclose that there was "mild tenting" of the rotator cuff, but no significant fluid was seen in the bursa.  (R. 325.)  No abnormal bone marrow was noted and there was only mild to moderate impingement of the rotator cuff.  (R. 310.)

On March 27, 2008, Plaintiff reported to the UF Orthopaedic Clinic for complaints of right shoulder pain radiating into her lumbar spine region. (R. 292.)  Plaintiff was being conservatively treated for her pain with heat and anti-inflammatories. *Id.*  Dr. Deenesh Shajpal noted that Plaintiff was "quite tearful and appears to be depressed." *Id.*  An examination revealed tenderness to palpation globally in the paraspinal muscles and the muscles of the trapezium; global tenderness around the shoulder to palpation;

and mildly tender to palpation on the AC joints and the biceps. *Id.* Dr. Shajpal noted

that Plainitff's x-rays were within normal limits AP and lateral of the shoulders, with no

evidence of significant abnormalities. *Id.* Dr. Shajpal stated that Plaintiff's diagnoses

was "a combination related to her current situation with her husband having passed

away and her having associated myofascial pain syndrome and pain secondary to her

depression." (R. 292-93.) Dr. Shajpal concluded that Plaintiff did not need surgery for

her shoulder at that time, but needed treatment for her depression. (R. 293.) Dr.

Shaipal said he would consider injection or physical therapy in the future if her

symptoms worsened. (R. 293.)

On September 12, 2008, Plaintiff was seen at the Shands at UF Clinic for sharp

upper back and chest and shoulder pain. (R. 307.) An examination of her anterior

chest revealed mild tenderness to palpation about the right mid-clavicular line near ribs

two to three, and tenderness to palpation about the medial border of the scapula on the

right over the rhomboids. *Id.* Plaintiff was tender over the AC joint and there was limited

range of motion of the right shoulder to a little over 100 degrees. *Id.* On examination Dr.

Kendall Campbell elicited pain with testing of the supraspinatus and infraspinatus

tendons. *Id.* Dr. Campbell stated that Plaintiff's pain was a radiation from her right

shoulder issue. He prescribed a trial dosage of Mobic and recommended that Plaintiff

rest and carry her purse on her other shoulder. *Id.*

Plaintiff reported to the Shands at UF Clinic again on February 12, 2009 with

continuing pain in her shoulder. (R. 304.) Dr. Campbell prescribed muscle relaxants as

a trial to see if it improved Plaintiff's symptoms. *Id.*

Plaintiff returned to Shands at UF Clinc on March 3, 2009 and received treatment from Dr. Kaleeswari Arulselvam.  (R. 302-303.)  Dr. Arulselvam started Plaintiff on Crestor for her high cholesterol, and discussed medications, diet, and exercise to reduce weight.  (R. 302.)  Dr. Arulselvam noted that "the range of movement in her right shoulder is good today," and that her symptoms of carpal tunnel were receiving "conservative management." *Id.*  Dr. Arulselvam noted that Plaintiff has osteoarthritis in her right shoulder. He prescribed a Lidoderm patch, capsicin cream, recommended warm showers and Tylenol and directed Plaintiff to continue taking Flexeril.  (R. 303.)  Dr. Arulselvam noted that the treatment plan was to "continue with conservative management," and that if her symptoms worsened Plaintiff would receive a referral for physical therapy and later follow up with orthopedic surgery. *Id.*

With regard to Plaintiff's alleged mental health issues, Dr. Linda Abeles, a licensed psychologist, performed a consultative examination of Plaintiff on May 7, 2009. (R. 341.) Dr. Abeles noted that Plaintiff was able to take care of her personal needs and go grocery shopping.  (R. 342.)  Plaintiff cried while discussing the death of her husband. *Id.* After examination Dr. Abeles concluded that although Plaintiff's judgment abilities appeared overly impulsive, her verbal reasoning was somewhat concrete, and her cognitive function would not be a hindrance to her ability to obtain or maintain employment. *Id.* Dr. Abeles diagnosed Plaintiff as suffering from bereavement and recommended referral of Plaintiff to a bereavement group.  (R. 343.)  Dr. Abeles concluded that Plaintiff's prognosis for future success in the workplace was fair.   *Id.*

Plaintiff was referred to another consultative examination. On May 13, 2009, Dr.

Eftim Adhami performed a consultative examination of Plaintiff.  (R. 338-39.)  Plaintiff reported a numbness and tingling in her hands and fingers, problems with lifting heavy items, and cramps in her hands, and back pain.  (R. 338.)  Dr. Adhami noted that Plaintiff was able to pick up small objects and button her clothes. Plaintiff's joints were "free in movement," and the strength of her hands was 5/5 even after repetitive movements. *Id.*  Dr. Adhami found that palpation of the epicondyles of the humera did not elicit any pain and that Plaintiff's back had a full range of motion. *Id.* Dr. Adhami concluded that Plaintiff's carpal tunnel syndrom was "mild," there were no motor symptoms or signs, and Plaintiff's right elbow lateral epicondylitis and right shoulder tendinosis and arthritis were in remission.  (R. 339.)

On July 2, 2009, Dr. Melvin Greer, a neurologist, examined Plaintiff.  (R. 358-361.)  Although Dr. Greer noted that Plaintiff complained of headaches and pain in her right side, he concluded that the findings on Plaintiff's June 5, 2009 brain MRI were incidental and, therefore, nothing further needed to be done.  (R. 358, 372.)  Dr. Greer diagnosed Plaintiff with migraines and migraine variant headaches. He noted that Plaintiff was a " patient who is under great stress, who sleeps very poorly and who is overweight."  (R. 360.)  Dr. Greer reassured Plaintiff that the changes on her brain MRI were incidental and had nothing to do with her problems. For treatment of Plaintiff's head pain he instructed Plaintiff to continue using acetaminophen. *Id.*  The only instructions offered by Dr. Greer was for Plaintiff to carry a lighter purse.  He also offered Plaintiff a trial of medications that would help her sleep better at night. *Id.*

State agency physician Dr. Minal Krishnamurthy completed a physical residual

functional capacity assessment on November 24, 2009. In the assessment Dr. Krishnamurthy concluded that Plaintiff only had light exertional limitations. He found that Plaintiff's "allegations exceed the objective findings."  (R. 378-385.)

On December 14, 2009, Dr. Michael Zelenka, a mental health practitioner completed a psychiatric review technique of Plaintiff. Dr. Zalenka concluded that Plaintiff had adjustment disorder with anxiety and depression, but that her mental impairments were not severe.  (R. 386-398.)

Plaintiff was again treated by Dr. Arulselvam in April and July 2010.  (R. 424-27.) She complained of numbness in her feet and hands and adjustment disorder after the death of her husband.  (R. 424.)  Plaintiff had discontinued Lexapro because it made her feel jittery. *Id.*  At Plaintiff's April visit, she appeared tearful and had a depressed affect, but at her visit in July it was noted that Plaintiff's adjustment disorder was getting better, and no medications were prescribed.  (R. 427, 425.) Dr. Arulselvam advised that Plaintiff keep a headache diary.   (R. 427.)

On February 17, 2011, Plaintiff treated with Dr. Michel Diab at Eastside Community Practice for her upper right back pain and carpal tunnel syndrome.  (R. 418.)  Dr. Diab noted tenderness, pain, and spasm in Plaintiff's cervical back, and tenderness and pain in her lumbar back, but a normal range of motion. *Id.*  Dr. Diab provided Plaintiff with Lidoderm patches and advised her to continue with ibuprofen as needed.  (R. 419.)  Dr. Diab also noted that "I think pt may need surgical intervention at this point, but she is declining[] at this time." *Id.*

On June 2, 2011, Plaintiff was seen by Dr. Richard Rathe at Eastside

Community Practice for her right shoulder pain.  (R. 415.)  Dr. Rathe noted that her pain was a new problem which started one to four weeks ago after lifting. *Id.*  Plaintiff did not experience any acute pain or a pop, but the pain had worsened since then. *Id.* Dr. Rathe noted decreased range of motion and prescribed her ibuprofen.  (R. 416.)

Plaintiff was seen by Dr. Diab again on August 4, 2011 for her right arm pain. (R. 413.)  Dr. Diab noted a decreased range of motion, tenderness, pain, and spasms, but no swelling, effusion, deformity, or laceration. *Id.* Dr. Diab noted that Plaintiff's symptoms were consistent with rotator cuff tendinitis. He ordered x-rays and referred Plaintiff for physical therapy.  (R. 414.)  Plaintiff followed up with Dr. Diab on August 8, 2011 after she received x-rays on her right shoulder pain.  (R. 411.)  Plaintiff had started taking ibuprofen, which was improving her pain, and was scheduled to begin physical therapy. *Id.* Dr. Diab noted that Plaintiff's x-rays showed no significant abnormalities of the shoulder or humerus. *Id.*

Plaintiff returned to Dr. Diab on October 3, 2011 for her continuing right arm and shoulder pain.  (R. 409.)  Plaintiff had been going to physical therapy, which was producing some improvement. But the physical therapist was concerned about a possible tear. *Id.*  Dr. Diab noted that Plaintiff's right shoulder exhibited a decreased range of motion, although she retained normal strength. Id.  Dr. Diab ordered an MRI to assess Plaintiff's right shoulder and brain and because Plaintiff had been experiencing headaches, he wanted to re-evaluate Plaintiff's  Chiari I malformation.  (R. 410.)

On October 19, 2011, an MRI of Plaintiff's right shoulder was conducted. The MRI showed a full thickness tear of the distal supraspinatus tendon, and fluid in the

subacromial subdeltoid bursa.  (R. 400.)  The MRI also disclosed that there were no

marrow signal abnormalities and there was no Hill-Sachs deformity. *Id.*  The MRI of

Plaintiff's brain showed findings "consistent" with mild Chiari I malformation.[22]  (R. 403-

404.)

Plaintiff followed up with the Eastside Community Practice on October 24, 2011.

(R. 405.)  Dr. Umar Ghaffer reviewed her MRI and advised Plaintiff to continue physical

therapy and continue using ibuprofen as needed for her shoulder pain.  (R. 408.)

### B. <u>Hearing Testimony</u>

At the hearing, Plaintiff's attorney noted that there were not many recent medical

records, and asked for a more recent consultative examination on account of Plaintiff's

recent increase in depression.

At the time of her hearing, Plaintiff was 50 years old and she lived with her

twenty year old son.  (R. 46.)  She testified that she had a driver's license and had

completed some college.  (R 46-47.)  Plaintiff testified about her past work as a medical

records clerk, radiology scheduler, and insurance verifier.  (R. 47.)  She stated that she

left her job because of the pain in her arm. *Id.*  She testified that she tried to obtain

another position, but could not.  (R. 47-48.)

Plaintiff tried to work at the Crab Shack, but left because of the pain in her right

arm after about three months.  (R. 49.)  She stated that she could not perform any job

because of the pain in her arm and back. *Id.* However, when the ALJ asked Plaintiff

---

[22] Chiari Malformation refers to malformed posterior fossa structures (the internal base of the skull where the cerebellum, pons and medulla oblongata rest).  *Stedman's Medical Dictionary*, 27th Ed., 238540.

whether she could do a desk job with no lifting, she answered "I guess I would need a lot of breaks to do it." (R. 50.) She stated that she would need a lot of breaks because her hands cramped while typing, and when she sat a lot she had to stand periodically. (R. 50.) When the ALJ asked whether she could do a job that allowed her to sit and stand as she wished, and did not require typing, Plaintiff replied that she was experiencing a lot of headaches. (R. 51.)

Plaintiff testified that she was receiving physical therapy and was being treated for her headaches, which were causing memory loss and sleeplessness. (R. 51.) She was taking 800 milligrams of ibuprofen for her pain. (R. 54.) Plaintiff said she could walk for about half a mile before she needed to rest. She could stand for about five minutes before she got numbness in her thighs. She could sit for around 30 minutes before she needed to stand and walk. (R. 55.) Plaintiff testified that she could lift around five or ten pounds. *Id.*

Plaintiff testified that she had recently seen a neurologist for her Chiari malformation. The neurologist had also treated her for depression and anxiety. (R. 55.) The doctor prescribed Prozac and Topamax, but she was not able to have the prescriptions filled because she could not afford them. *Id.*

The ALJ asked Plaintiff why she was depressed, and she stated that she was still grieving the death of her husband. (R. 56.) She said that she had problems being around crowds of people, but that she got along fine with her son and could deal with strangers. (R. 56.) Plaintiff testified that she had lost interest in things, such as going to church. And she was unable to do things like bowling, which she used to love. (R.

56-57.)  She said that she felt like she could not go on, like she "want[ed] to just give it up sometimes and let it go."  (R. 58.)  She said that her anxiety made her feel overwhelmed.  (R. 58.)  She enjoyed watching comedy on TV.  (R. 56.)

Plaintiff said that she and her son both did the booking, laundry, shopping, and housework.  (R. 57.)  She stated that sometimes she did not remember what she was doing and had to think back, or start doing something else, which happened several times per week.  (R. 59.)

### C.    Findings of the ALJ

The ALJ found that the Plaintiff had the following severe impairments: obesity, gastroesophageal reflux disease, right shoulder disorder and chiari one malformation. The ALJ determined that Plaintiff's carpal tunnel syndrome, hyperlipidemia, spurs of thoracic spine and right elbow epicondylitis, were non-severe impairments because her symptoms had been well controlled through physical therapy and through the use of ibuprofen on an as needed basis.  Further, the ALJ concluded that Plaintiff's depression was non-severe because it did not cause more than minimal limitations on her ability to perform basic mental work activities.  The ALJ concluded that Plaintiff could perform light work with the exception that she was limited to occasional overhead reaching. Based upon this RFC the ALJ concluded that Plaintiff was not disabled because she could perform her past relevant work as a medical record clerk, hospital admitting clerk, billing clerk, and receptionist as actually and as generally performed.

### IV. DISCUSSION

Plaintiff raises one issue on appeal: whether the ALJ erred at step two by not

finding that her chronic back pain, bilateral carpal tunnel syndrome, rotator cuff tear, depression, and migraine headaches were severe impairments.  Plaintiff further argues that as a result of this error, the ALJ failed to consider properly the combined effects of all of Plaintiff's impairments.  For the reasons discussed below, the Court concludes that the ALJ did not err at step two and that the ALJ's step two decision is supported by substantial evidence. Further, the ALJ properly considered all of Plaintiff's impairments in making a finding that Plaintiff was not disabled.

Plaintiff's argument fails for two primary reasons. First, the ALJ does not commit reversible error if he does not identify every impairment at step two, so long as he discusses and evaluates all of a claimant's impairment. Rather, once the ALJ concludes that a claimant has an impairment that satisfies step two, the ALJ then is required to move to the next step in the social security sequential analysis and evaluate the functional limitations, if any, of all of the claimant's impairments. The ALJ did so here.

Second, even assuming the ALJ is required to identify all of the impairments at step two, the ALJ did not err. The ALJ specifically found at step two that Plaintiff's depression and bilateral carpal tunnel syndrome were not severe impairments. Further – and contrary to Plaintiff's argument that the ALJ did not include the right shoulder rotator cuff tear as a severe impairment – the ALJ specifically included and identified Plaintiff's "right shoulder disorder" as a severe impairment at step two. As to Plaintiff's chronic back pain and migraine headaches, while the ALJ did not specifically identify these impairments at step two, it is obvious that he fully considered them because he discussed those impairments in detail in evaluating the Plaintiff's RFC.

As a threshold matter the Court must determine whether it is error for the ALJ not to identify every impairment at step two.  While the Eleventh Circuit has never directly addressed this precise issue, there is strong support for the position that the ALJ does not commit reversible error if he fails to identify every impairment, so long as the ALJ considers and evaluates all of the impairments during the five step sequential evaluation.

The  Eleventh Circuit, as well as numerous other circuits, have held that step two of the sequential analysis may do no more than screen out *de minimis* claims.[23]  An impairment or combination of impairments is severe at step two of the sequential evaluation if it significantly limits a claimant's physical or mental ability to do basic work activities.[24]  To be considered "severe" a medical condition must constitute more than a "deviation from purely medical standards of bodily perfection or normality."[25]

It follows that the ALJ  is not required to identify all of the impairments that should be considered severe.  *See Heatly v. Commissioner of Social Sec.,* 382 F. App'x 823 (11th Cir. 2010) (finding harmless error where the ALJ determined the claimant's only severe impairment was status-post cervical fusion, despite a separate diagnosis of back pain).  Thus, the purpose of step two and the only requirement at step two is to identify if any severe impairment exists.  *Id.* ("Nothing requires that the ALJ must

---

[23] Stratton v. Bowen, 827 F.2d 1447, 1453 (11th Cir. 1987); see also Anthony v. Sullivan, 954 F.2d 289, 294-95 (5th Cir. 1992); Bailey v. Sullivan, 885 F.2d 52, 56-57 (3rd Cir. 1989).

[24] 20 C.F.R. § 404.1520(c).

[25] McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

identify, at step two, all of the impairments that should be considered severe.")

In this case, because the ALJ determined at step two that Plaintiff suffered from the severe impairments of obesity, gastroesophagel reflux disease, right shoulder disorder, and Chiari one malformation, that finding was sufficient to satisfy step two and thus there was no error in not listing every impairment.[26]

Secondly, putting aside whether the ALJ is required to identify every impairment at step two, the record is clear that the ALJ properly evaluated all of Plaintiff's impairments during the sequential analysis.  The ALJ evaluated all of Plaintiff's impairments and concluded that Plaintiff's bilateral carpal tunnel syndrome and depression were not severe impairments at step two. He then evaluated Plaintiff's right shoulder disorder, back problems and headaches as part of his evaluation of Plaintiff's RFC at step four and took these impairments into consideration in limiting Plaintiff to light work and by including lifting limitations in the RFC. Thus, any error in not listing these impairments at step two was at best harmless error.

Turning to the ALJ's conclusion that Plaintiff's carpal tunnel syndrome was not a severe impairment at step two, the ALJ discussed and relied upon the fact that there were "no motor signs or symptoms" with regard to Plaintiff's carpal tunnel syndrome and the condition was noted to be in remission. The treatment records related to Plaintiff's carpal tunnel syndrome show that Plaintiff's symptoms were well-controlled with physical therapy and using ibuprofen on an as needed basis. Plaintiff underwent

---

[26] Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987)("[w]hether or not it [the impairment] qualifies as a disability and whether or not it results from a single severe impairment ... is enough to satisfy the requirement of step two."); Maziarz v. Secretary of Health and Human Services, 837 F.2d 240, 244 (6th Cir. 1987).

little, if any, treatment for this condition other than taking non-narcotic medications. The ALJ further noted that the physical examination revealed no nerve impingement and Plaintiff had full grip strength. (R. 338.)  And while one attending doctor discussed the need for surgery Plaintiff declined surgery and there is no evidence in the record that any further treatment was provided. Thus, the Court has no problem concluding that the ALJ's determination that Plaintiff's carpal tunnel syndrome was not severe at step two is fully supported by the record.

With regard to depression and mental health impairments, the ALJ appropriately pointed out that Plaintiff's depression had increased since the death of her husband and thus was related to bereavement.  The ALJ determined that Plaintiff's depression was not severe because she has "not had much by way of treatment" for her depression other than medication management by her primary care physician.  The ALJ also had the benefit of the opinions of two separate state agency physicians, each of whom determined that Plaintiff's alleged mental impairments were "non-severe." (R. 344-56, 386-98.)

In addition to this evidence the ALJ also discussed and relied upon Plaintiff's May 2009 consultative examination with Linda Abeles, Ph.D. Dr. Abeles' examination and report disclose that Plaintiff was fully oriented, her memory abilities were intact, and although she appeared overly impulsive, Plaintiff's  verbal reasoning was "somewhat concrete."  (R. 341.)  Dr. Abeles' only diagnosis was bereavement due to the death of Plaintiff's husband.  Notably, with regard to functional limitations, Dr. Abeles opined that Plaintiff's level of cognitive function would not be a hindrance to her ability to obtain or

maintain employment.  (R. 342.)  The ALJ properly relied upon this examination and

opinion in concluding that Plaintiff's depression and mental health issues did not cause

any significant limitation in Plaintiff's ability to engage in basic work activities.

Plaintiff's argument that the ALJ erred in not identifying the right rotator cuff tear

as a severe impairment at step two is flawed because Plaintiff's argument ignores both

the ALJ's express finding at step two that Plaintiff had a right shoulder disorder and

ignores the fact that the ALJ actually accounted for this impairment by limiting Plaintiff's

RFC to only occasional overhead lifting.  While the ALJ did not specifically identify the

impairment at step two as a "right rotator cuff tear" the ALJ expressly found that Plaintiff

had the severe impairment of "right shoulder disorder." The right should disorder was

the one relating to Plaintiff's torn right rotator cuff and thus - contrary to Plaintiff's

assertion –  the ALJ properly identified this impairment at step two. Moreover, in

addition to identifying the right shoulder disorder as a severe impairment at step two,

the ALJ fully discussed the impairment later in evaluating Plaintiff's RFC. The ALJ fully

accounted for Plaintiff's limitations in the right shoulder by limiting Plaintiff to only

occasional overhead lifting.  Thus, Plaintiff's argument is belied by the ALJ's written

decision.

However, any error at step two was harmless because the ALJ considered all of

Plaintiff's complaints and medical records in formulating her residual functional capacity

and limiting her to light work with only occasional overhead reaching. The ALJ

specifically stated that he "considered all symptoms and the extent to which these

symptoms can reasonably be accepted as consistent with the objective medical

evidence." Lastly, the ALJ noted that none of Plaintiff's examining or consultative physicians opined that she was disabled.

Therefore, it is evident that the ALJ considered all of Plaintiff's impairments in combination, having discussed in detail Plaintiff's testimony and medical history, including complaints of pain attributable to her non-severe impairments of chronic back pain, rotator cuff tear, bilateral carpal tunnel syndrome, depression, and migraine headaches, and limiting Plaintiff to light work with only occasional overhead lifting.

Accordingly, based upon this record, the Court concludes that the ALJ did not err in his step two determination by not listing additional severe impairments, and did not fail to consider Plaintiff's impairments in combination. The Court, therefore, concludes that the ALJ's determination is supported by substantial evidence and, thus, the decision of the Commissioner is due to be affirmed.

### V. CONCLUSION

In light of the foregoing it is **ORDERED** that the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter final judgment and close the file.

**DONE AND ORDERED** this 12th day of March 2014.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge